VILLAGE OF GRAFTON,
et al., Plaintiffs,

v.

RURAL LORAIN COUNTY
WATER AUTHORITY,
et al., Defendants.

Nos. 1:02 CV 2037 to 1:02 CV 2039.

United States District Court,
N.D. Ohio,
Eastern Division.

April 16, 2004.

---

Gretchen A. Holderman, Lillie & Holderman, Richard G. Lillie, Lillie & Holderman, Cleveland, OH, Jay C. Marcie, Avon Lake, OH, for Plaintiffs.

Daniel D. Mason, Baumgartner & O'Toole, Dennis M. O'Toole, Baumgartner & O'Toole, Sheffield Village, OH, for Defendants.

## MEMORANDUM OF OPINION AND ORDER

POLSTER, District Judge.

Before the Court are the following cross-motions for summary judgment:

1. Motion for Summary Judgment, filed by Village of Grafton and KNG, Ltd. ("Grafton's Motion") (**Case No. 1:02 CV 2037, ECF No. 40; Case No. 1:02 CV 2039, ECF No. 11**) and

2. Motion for Summary Judgment of Rural Lorain County Water Authority ("RLCWA's Motion") (**ECF No. 41**).[1]

The parties have agreed that this case involves a legal issue which can be resolved entirely on written briefs.[2] For the following reasons, Grafton's Motion is **DENIED** and the RLCWA's Motion is **GRANTED**.

## I. BACKGROUND [3]

The Rural Lorain County Water Authority ("RLCWA") is a political subdivision formed in 1974, pursuant to O.R.C. §§ 6119.01, *et seq.*, to provide water and/or sewer service to rural areas located in southern Lorain County, Ohio, including Grafton and Eaton Townships. *First Stip.*

---

1. The RLCWA's motion is actually entitled "Combined Brief in Opposition and Motion for Summary Judgment of Rural Lorain County Water Authority." *See ECF No. 41,* at 1.

2. *See infra,* at 572 n.5.

3. To avoid confusion, further citations to the record will be to the earlier-filed consolidated case, No. 1:02 CV 2037, unless otherwise stated. Also, the parties have filed three documents with stipulations of fact. The first stipulation is located at ECF No. 39 and is referenced as "First Stip;" the second is located at ECF No. 44 and is referenced as "Second Stip;" and the third is located at ECF No. 45 and is referenced as "Third Stip."

¶ 2; *Second Stip., Ex. A.* The Resolutions enacted by Grafton and Eaton Townships in anticipation of the creation of the RLCWA expressed the Townships' intention "that the entire territory of said Township be included within the proposed regional water district for southern Lorain County ... excluding, however, any and all existing water lines within said Township." *Second Stip., Exs. C, D.* At the time the RLCWA was created, Grafton owned and operated its own water distribution system, with water supplied by its own plant. *Second Stip.* ¶ 2. Additionally, the property that came to be known as Fox Run, undeveloped at the time, was located in Eaton Township.

In the late 1980s, the Shamrock Development Company ("Shamrock") purchased the Fox Run property. *ECF No. 40, Ex. B, Affidavit of Kevin Flanigan* ("Flanigan Aff.") ¶ 2. In June 1990, Fox Run, still undeveloped, was annexed into the Village of Grafton. *First Stip.* ¶ 5. Shortly thereafter, Shamrock entered negotiations with Grafton to develop Fox Run. *Flanigan Aff.* ¶ 4. In initiating these discussions, Shamrock relied upon its belief that water service would be provided by Grafton at lower rates than those that would be imposed by the RLCWA. *Id.* ¶ 5. Kevin Flanigan, a partner in Shamrock, bought out his partner and subsequently transferred the Fox Run property into KNG, Ltd.—a company of which he is currently a member and which company now owns and is developing Fox Run. *Id.* ¶¶ 7, 8.

In 1994, Grafton abandoned its water plant and began purchasing water from the RLCWA, pursuant to a series of Water Purchase Agreements. *RLCWA's Motion, Ex. A* ("Mahoney Aff.") ¶ 3. The first Agreement the parties entered is dated September 6, 1994. *See Second Stip., Ex. G.* ("1994 Agreement"). The 1994 Agreement shows that in order to receive RLCWA water, Grafton connected its own water distribution system to a 16-inch transmission line built by the RLCWA on Mennell Road in 1987 to handle the increased demand for water in the western and southern parts of the water district. *Id.,* at 2. The 1994 Agreement required the RLCWA to provide, and Grafton to purchase, up to 275,000 gallons of water per day ("GPD") not to exceed 250 gallons per minute ("GPM"). *Id.*

In 1998, Grafton sought an increase to the aforementioned limits due to the proposed building of a new correctional facility within its municipality. *Mahoney Aff.* ¶ 4. On March 2, 1999, Grafton entered into a second Water Purchase Agreement with the RLCWA. *Second Stip., Ex. F* ("1999 Agreement"). In addition to the amounts set forth in the 1994 Agreement, the 1999 Agreement required the RLCWA to provide, and Grafton to purchase, a quantity of water not to exceed 250,000 GPD or 250 GPM. *Id.,* at 2. This water was to be furnished from an existing water tank through an existing RLCWA transmission line at State Route 83 ("SR 83"). *Id.*

By 2001, Grafton was regularly exceeding the limits of the parties' agreement. The RLCWA made repeated threats to take Grafton to court to enforce what the RLCWA believed to be its right to provide water service to certain areas located within Grafton. *Grafton's Motion, Ex. C, Affidavit of Richard Kowalski* ("Kowalski Aff.") ¶¶ 5, 6. The parties apparently resolved their dispute by entering into a third Water Purchase Agreement on March 5, 2002. *Second Stip., Ex. E* ("2002 Agreement"). The 2002 Agreement required the RLCWA to provide and Grafton to purchase, a quantity of water not to exceed 600,000 GPD or 650 GPM. *Id.,* at 2. Grafton agreed to pay for a minimum of 300,00 GPD, and to pay "the current

RLCWA rate plus 100% for any gallons in excess of 600,000 GPD." *Id.*

In order to provide this additional water, the RLCWA recognized the need to reinforce the supply lines. *Mahoney Aff.* ¶ 5. Accordingly, the RLCWA installed a 24–inch water line on Grafton Eastern Road between SR 83 and Island Road. This project, along with others, was financed by a promissory note dated January 16, 2002 in the amount of $3.25 million, guaranteed by the USDA, Rural Economic and Community Development Service (the "USDA loan"). *See Mahoney Aff.* ¶¶ 5–7 *and Attachments.*[4] Of this $3.25 million loan, approximately $280,000 is attributed to the installation of the 24–inch line serving Grafton. *Id.* To secure this USDA loan, the RLCWA pledged all of its water service revenues. *Case No. 1:02 CV 2039, ECF No. 1* ¶ 11.

On August 20, 2002, Council for Grafton enacted Ordinance No. 02.031 authorizing the development of Fox Run. *First Stip.* ¶ 7. In short order, Grafton, or KNG under Grafton's auspices, began installing water lines in Fox Run and is now providing water to the fledgling development.

On October 15, 2002, the RLCWA filed a verified complaint and sought a temporary restraining order enjoining Grafton and/or KNG from installing water lines in Fox Run. On the same day, Grafton filed a complaint seeking injunctive and declaratory relief to the effect that it had the exclusive right to serve Fox Run. The Court denied the RLCWA's motion for temporary restraining order because of the Court's conclusion that the RLCWA failed to show irreparable harm. *See Case No. 1:02 CV 2039, ECF No. 6,* at 1–2. The Court subsequently consolidated the two cases and issued a scheduling order with discovery and other deadlines and dispositive motion briefing schedule which included the filing of stipulated facts. *Id., ECF No. 8* The scheduling order noted the parties' agreement that their dispute involved a legal question which could be resolved entirely on paper,[5] and that there was no need for Defendant KNG to file any briefs separate from those filed by Grafton. *Id.,* at 1. The scheduling order also noted the parties' agreement to work out interim arrangements for handling tap-in fees and proceeds from any retail water sales. *Id.,* at 2.

According to the parties' stipulations, it has been estimated that approximately 30 new homes or businesses will be constructed in Fox Run.[6] *Second Stip.* ¶ 4. A one-time tap-in fee will be charged to each new customer. *Id.* The RLCWA charges its customers $2,000 per tap-in ($750 of which covers the actual cost of the tap-in, the balance of which is earmarked for capital improvements for new tanks necessitated by new taps). *Id.* Grafton charges its customers $800 per tap-in. *Id.* The RLCWA supplies all of Grafton's water, for which Grafton pays a bulk rate of $11.50 per month per 5131 gallons of water

---

**4.** *See specifically* the following attachments which are not referenced by any number or letter: Amendment to Note, Conditional Commitment for Guarantee, RLCWA Additional Conditions and Requirements, and Lender's Certification.

**5.** In its summary judgment motion, Grafton contended that there was an issue of fact regarding whether the RLCWA could provide water service to Fox Run within a reasonable period of time. *See Grafton's Motion,* at 22.

However, the parties subsequently filed a stipulation agreeing that the RLCWA has a transmission line running up to Fox Run and that it could provide water service to Fox Run residents overnight. *See Case No. 1:02 CV 2037, ECF No. 45* ¶¶ *1–2.*

**6.** In a recent telephone conference, however, Grafton asserted that there may be as many 100 units built in the Fox Run subdivision.

(the average number of gallons used per month per customer). *Id.* The RLCWA charges its non-bulk customers $30.24 per month per 5131 gallons *Second Stip.* ¶ 4. The parties agree that if the Court concludes that Grafton or KNG's conduct in constructing the water lines to Fox Run does not violate § 1926(b)'s anti-curtailment provisions, the RLCWA will receive $224 less per year, per customer, in water service revenues. *Id.* Assuming at least 30 new customers, the RLCWA stands to lose a minimum of $6720 per year in revenues.[7] *Id.*

The parties have filed the pending summary judgment motions, arguing that each has the right to provide water service to Fox Run. The RLCWA argues that Grafton's efforts to serve Fox Run (i.e., to install water lines, charge tap-in fees and purchase water at wholesale from the RLCWA and sell at retail to Fox Run residents) violates the federal statute that prohibits municipalities from curtailing the services of federally indebted rural water associations, 7 U.S.C. § 1926(b). Grafton counters that it has the exclusive right to serve Fox Run under the Ohio constitutional provision permitting municipalities to provide utility services to its residents. Grafton argues, in the alternative, that its provision of water service to Fox Run does not violate § 1926(b) because its curtailment of the RLCWA's services, if any, occurred when Grafton annexed Fox Run in 1990—without any objection from the RLCWA and prior to the RLCWA's indebtedness to the federal government.

As a practical matter, the Court notes that this case is really about whether Grafton can continue to provide water to persons in previously undeveloped parts of Grafton at either the bulk rate (the rate charged by the RLCWA to Grafton) or at a markup similar to what the RLCWA charges its non-bulk customers. The parties agree that the RLCWA will continue to supply water to Grafton residents after the conclusion of this lawsuit. The parties are not fighting over the water supply itself. Rather, they are fighting over who will retain the tap-in fees and monthly revenues for serving these new customers. For reasons discussed below, the Court concludes that, based on the facts of this case, Grafton's efforts to retain the tap-in fees and monthly water revenues of Fox Run residents violates the federal anti-curtailment statute.

## II. SUMMARY JUDGMENT STANDARD

In evaluating cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the nonmoving party." *Le–Ax Water Dist. v. City of Athens, Ohio*, 174 F.Supp.2d 696 (S.D.Ohio 2001) (citing *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 958 (6th Cir.1998), in turn quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir.1994)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences there-

---

7. Based on figures mentioned in the recent telephone conference, *see supra*, at 5 n. 7, if there are 100 new customers in Fox Run, the RLCWA stands to lose approximately $22,400 per year in water service revenues.

from in a light most favorable to the non-moving party." *Williams v. Belknap*, 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987)). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue for trial. *See LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993).

### III. LAW AND ANALYSIS

The Agricultural Act of 1961 was enacted by Congress, in part, "to provide insured loans to sparsely populated rural communities for a variety of otherwise unaffordable services and improvements." *James Island Pub. Serv. Dist. v. City of Charleston, So. Carolina ("James Island")*, 249 F.3d 323, 325 (4th Cir.2001) (citing S.Rep. No. 566 (1961) *reprinted in* 1961 U.S.C.C.A.N. 2243, 2305–06). Title III of the Act (formerly known as the Farmers Home Administration Act, now known as the Consolidated Farm and Rural Development Act of 1972) (the "Act"), was primarily concerned with issues of agricultural credit. *Le–Ax Water Dist. v. City of Athens, Ohio ("Le–Ax")*, 346 F.3d 701, 704 (6th Cir.2003). Section 306(a) of the Act, now codified at 7 U.S.C. § 1926(a), authorizes the Secretary of Agriculture to make or insure loans to local rural water associations for water conservation, use, development and control projects. *Id.; Scioto County Reg'l Water Dist. No. 1 v. Scioto Water, Inc. ("Scioto")*, 103 F.3d 38, 40 (6th Cir.1996). Section 306(b), now codified at 7 U.S.C. § 1926(b), protects the recipient of those federal loans from competition by expanding municipalities. *Le–Ax*, 346 F.3d at 704; *Moongate Water Co., Inc. v. Butterfield Park Mut. Domestic Water Ass'n*, 291 F.3d 1262, 1265 (10th Cir.2002). Specifically, Congress requires

as a condition of receiving these loans, that:

> [t]he service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b); *James Island*, 249 F.3d at 325.

Federal courts have uniformly held that § 1926(b) establishes a "bright line rule" which unambiguously prohibits the curtailment of a federally indebted water association's service by any form of municipal encroachment, and that any doubts about whether a water association is entitled to § 1926(b) protection should be resolved in favor of the federally indebted water association. *See, e.g., Adams County Reg'l Water Dist. v. Village of Manchester, Ohio ("Adams")*, 226 F.3d 513, 517–18 (6th Cir. 2000) (citations omitted); *Wayne v. Village of Sebring*, 36 F.3d 517, 527–28 (6th Cir. 1994); *Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow ("Sequoyah")*, 191 F.3d 1192, 1197 (10th Cir.1999); *North Alamo Water Supply Corp. v. City of San Juan, Tex. ("North Alamo")*, 90 F.3d 910, 913 (5th Cir.1996); *City of Madison, Mississippi v. Bear Creek Water Ass'n, Inc. ("Madison")*, 816 F.2d 1057, 1059–60 (5th Cir.1987).

Circuit courts examining the history of § 1926(b) have articulated two Congressional purposes behind its enactment: (1) to encourage rural water development by

expanding the number of potential users, thereby decreasing the per-user cost, and (2) to safeguard the viability and financial security of federally indebted water associations by protecting them from expansion by nearby municipalities. *See, e.g.,* 93 F.3d at 233 (citing *Madison,* 816 F.2d at 1060, in turn citing S.Rep. No. 566, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Admin. News 2243, 2309). In *Le–Ax,* the Sixth Circuit recently explained that § 1926(b) was intended to protect " 'the territory served by such an association facility against [other] competitive facilities' such as local governments, as otherwise rural water service might be threatened by 'the expansion of the boundaries of municipal and other public bodies into an area served by the rural system.' " 346 F.3d at 705 (citing S.Rep. No. 87–566, at 67 (1962), *reprinted in* 1961 U.S.C.C.A.N. 2243, 2309). The *Le–Ax* court further explained that the concept of economies of scale underlies § 1926(b):

> [B]y protecting a rural water association's customer base, the provision allows such associations to spread their fixed costs over a large group of users. In so doing, the statute aims to prevent rural water costs from becoming prohibitively expensive to any particular user, to develop a system providing fresh and clean water to rural households, and to protect the federal government as insurer of the loan. *Id.* ("By including service to other rural residents, the cost per user is reduced and the loans are more secure in addition to the community benefits of a safe and adequate supply of running household water."); *see also Lexington—S Elkhorn Water Dist. v. City of Wilmore,* 93 F.3d 230, 233 (6th Cir.1996) (stating that the Act "safe-

guard[s] the financial viability of rural associations and Farmers Home Administration loans" and "encourage[s] rural water development by expanding the number of potential users").

346 F.3d at 705.

 In order to prevail on a § 1926(b) claim, the water association claiming protection must establish the following three elements:

(1) it is an "association" within the meaning of the Act,

(2) it is indebted to the Department of Agriculture (formerly Farmers Home Administration, now RECDS), and

(3) it has provided or made service available to the disputed area.

*Le–Ax,* 346 F.3d at 705 (citing *Adams,* 226 F.3d at 517). In addition to these elements, the Sixth Circuit recently held that the text and legislative history of § 1926(b) demonstrates that the statute was intended to be used in a defensive manner, i.e., to protect federally indebted rural water associations "from the outside threat of local government's taking their customers—not as a weapon for water associations to use to recruit new users outside of their boundaries." *Id.,* 346 F.3d at 708. Thus, "[w]hen a rural water district's boundaries are geographically determined by the state, we hold that a rural water district cannot use § 1926(b) as a sword to force new customers who are outside that geographic area to receive water service through the rural water district."[8] *Id.*

Here, it is undisputed that the RLCWA is an "association" within the meaning of the Act. *See First Stip.* ¶ 2. It is also

---

8. *But see dissent,* 346 F.3d at 710–11, wherein Judge Gibbons concluded that the Le–Ax Water District was employing § 1926(b) as a shield to protect its service boundary, and

that "the flaw in the majority's analysis is that it conflates an association's political boundary with an association's service boundary."

undisputed that the RLCWA has been indebted to the Department of Agriculture since January 16, 2002. *Id.* ¶ 6. There is a dispute, however, over whether the RLCWA can establish the third prerequisite, i.e., whether it has "provided or made service available" to Fox Run.

■ Because the RLCWA has not provided water service to Fox Run, the RLCWA must show that it has made such service available. In the absence of any explanation of the phrase "made service available" in the statute or legislative history of § 1926(b), the Sixth Circuit has interpreted this phrase to require a water association to show that (1) it has the physical ability to provide service to the area in question, and (2) it has the legal right under state law to do so. *See Le–Ax,* 346 F.3d at 706 (citing *Lexington–South Elkhorn Water Dist. v. City of Wilmore, Ky. ("Lexington–South Elkhorn"),* 93 F.3d 230, 235–37 (6th Cir.1996)). The physical ability prong, commonly referred to as the "pipes in the ground" test, requires the association to show that it has "adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made." *Id.* (quoting *Sequoyah,* 191 F.3d at 1203).

■ The parties have stipulated that the RLCWA has a transmission line running up to the Fox Run subdivision, and that it can run service lines into the subdivision "overnight." *Third Stip.* ¶¶ 1, 2. Thus, the RLCWA has satisfied the pipes-in-the-ground test. The parties disagree, however, over whether the RLCWA has the legal right to serve Fox Run.

■ Ohio law gives water districts plenary authority "[t]o supply water to users within and without the district." *Le–Ax,* 346 F.3d at 707 (quoting O.R.C.

§ 6119.01(A)). Because the RLCWA is a regional water district in the State of Ohio, and because Fox Run is located within the RLCWA's service district, the Court concludes that the RLCWA has the legal right to serve Fox Run. *Id.*

■ While Grafton admits that "Fox Run was an area within the water district served by RLCWA and was included in the original plan forming RLCWA's organization and approved by the Lorain County Court of Common Pleas in 1974,"[9] Grafton argues, nonetheless, that its lawful annexation of Fox Run from Eaton Township served to remove it from the RLCWA's district. The Court disagrees.

The entire territories of Grafton and Eaton Township, excluding water lines existing in 1974, are within the RLCWA's district. *See Third Stip.,* Exs. A, C, D. Grafton does not adequately explain why undeveloped property located within one township in the RLCWA's district took on a different status simply by virtue of its annexation by another township in the RLCWA's district.

Second, the federal anti-curtailment statute specifically anticipates that a city will use its annexation of property located within the service area of a rural water association as a basis to provide service to that property, and expressly prohibits such provision of service while the water district is indebted to the federal government. *See* 7 U.S.C. § 1926(b).

Third, case law shows that a municipality's annexation of property located within a rural water association does not, of itself, remove it from the water district for § 1926(b) purposes. *See, e.g., Glenpool Util. Serv. Auth. v. Creek County Rural Water Dist.,* 861 F.2d 1211 (10th Cir.1988) (holding that § 1926(b) prohibited munici-

---

**9.** *Grafton's Motion,* at 5.

pality from using its annexation of territory within rural water district as springboard for providing its own water service to residents); *Bell Arthur Water Corp. v. Greenville Util. Comm'n*, 173 F.3d 517, 525 (4th Cir.1999) (city's annexation of property within a water district was not deemed to take that property out of the district's service area if the water district could show that it made services available to that property and was federally indebted); *James Island*, 249 F.3d 323 (holding that city's annexation of various portions of land within water district, along with city's provision of services and taxation of annexed residents, did not remove that property from water district for § 1926(b) purposes); *Madison*, 816 F.2d 1057 (holding that city's annexation of land within area served by water district did not act to remove that land from water district's service area). *Cf. Wayne*, 36 F.3d 517 (holding that village could not condition provision of water services on annexation where prospective customer was within a rural water association's service area and the water association was federally indebted); *Lexington–South Elkhorn*, 93 F.3d 230 (holding that neither municipality nor rural water association had the exclusive right to provide water service to annexed property where both providers were federally indebted).

Grafton also argues that, because Fox Run is now part of Grafton, Grafton has the exclusive right, pursuant to Article XVIII, Section 4 of the Ohio Constitution, to provide water service to Fox Run. Grafton is correct that Article XVIII, Section 4, of the Ohio Constitution grants to municipalities the power to provide water service to its residents:

> Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the products or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or produce of any such utility.

OHIO CONST., art. XVIII, § 4. While Ohio courts have referred to this constitutional grant of authority as "exclusive," the same courts have routinely held that a statute enacted to promote the health, safety and welfare of the public trumps this constitutional grant if the statute does not substantially interfere with the municipality's power. In *Ottawa County Bd. of Comm'rs v. Marblehead*, 86 Ohio St.3d 43, 711 N.E.2d 663 (1999), for example, the Ohio Supreme Court held that O.R.C. § 6103.22 (the statute enabling an established county sewer district to complete an existing water service project when territory within the project area acquires municipal status through annexation) was a valid exercise of the state's police power that did not substantially interfere with a municipality's constitutional authority to provide utility service to its residents. *See id.*, at 45, 711 N.E.2d 663. In *Hudson v. Summit County ("Hudson")*, 97 Ohio St.3d 296, 779 N.E.2d 758 (2002), the Ohio Supreme Court held that a municipality's constitutional authority to provide utility service to its residents did not prohibit a county, under O.R.C. § 6103.22 (the statute enabling counties to enter into water supply contracts), from conveying its water system to a different municipality. *Id.*, at 300, 779 N.E.2d 758.

■ In the instant case, the RLCWA is a political subdivision of the State of Ohio created under the State's police power and operating under authority of Chapter 6119

of the Ohio Revised Code. In enacting the resolution declaring its intention "that the entire territory of the township be included in [the RLCWA]," Grafton expressly declared the resolution "to be an emergency measure necessary for the immediate preservation of the health, safety and welfare of the Township . . . ." *Third Stip., Ex. D.* In approving the petition for organization of the RLCWA, the Lorain County Common Pleas Court expressly found that the RLCWA district was "necessary" and "conducive to the public health, safety, convenience and welfare," and that the RLCWA's operational plan was "economical, feasible, fair and reasonable." *Third Stip., Ex. A* ¶ 4. Thus, all parties involved in the creation of the RLCWA district, including Grafton, considered that act to be an appropriate use of the State's police power.

■ Moreover, as a regional water district, the RLCWA has the authority to exercise in its own name all the rights, powers, and duties vested in it under O.R.C. § 6119.01, including making and executing all contracts, agreements and instruments necessary to the performance of its duties, O.R.C. § 6119.01(O), and receiving and accepting federal grants, O.R.C. § 6119.01(T). A state receiving federal funds is deemed to have voluntarily and knowingly accepted the conditions imposed upon receipt of those funds. *Le–Ax*, 174 F.Supp.2d at 708 (citing *Pennhurst State Sch. And Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694

(1981)). *See also James Island*, 249 F.3d at 327. Thus, the Ohio statute conferring upon water districts the right to incur federal debt constitutes evidence that the State has knowingly and voluntarily accepted those conditions. *Id.* (citing O.R.C. § 6119.06; *Glenpool*, 861 F.2d at 1215–16) (parenthetical omitted).

For all these reasons, the Court finds that the Ohio statutes enabling water districts to incur federal debt constitute a valid exercise of the State's police power which does not substantially interfere with a municipality's authority to provide utility service to its residents.[10]

Grafton argues, in the alternative, that it is not barred by § 1926(b) from providing water service to Fox Run residents because its curtailment of the RLCWA's service, if any, occurred at the moment of annexation—twelve years prior to the time the RLCWA became federally indebted. According to Grafton, because the RLCWA did not object to the annexation of Fox Run in 1990, the water association effectively waived its right to invoke § 1926(b) today.

■ The parties have not cited, nor has the Court been able to find, any federal case that has dealt with a factual situation where the annexation of undeveloped land located in a designated water service area occurred years *prior to* a water association's federal indebtedness, but where the actual attempt by the municipality to serve the disputed area occurred *after* the association became federally indebted.[11] Thus,

**10.** Grafton argues that two Ohio Supreme Court cases dictate the conclusion that a municipality's state constitutional right to provide water service to its residents is exclusive. *See Grafton's Motion*, at 18–22 (citing *Village of Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 671 N.E.2d 241 (1996), and *Village of Lucas v. Lucas Local School Dist.*, 2 Ohio St.3d 13, 442 N.E.2d 449 (1982)). The Court finds, *inter alia*, that the cited cases are distin-

guishable from the instant case because neither action involved the right of a water association (whose existence, territory, rights and services are defined and authorized by Ohio statute pursuant to the State's police powers, and whose service is protected by federal statute) to provide service within the water association's statutorily-defined district.

**11.** In support of its proposition that the date of curtailment is the date of annexation, Graf-

this case presents an issue of first impression in the Sixth Circuit. Based on the plain language of § 1926(b), case law interpreting the statute and the policy upon which it was enacted, the Court concludes that the date of curtailment is *not* the date that Grafton annexed Fox Run, but the date Grafton began installing water lines in Fox Run for the following reasons.

First, rural water associations have no general standing to block municipal annexations of undeveloped land for no reason. If the RLCWA had tried to oppose the annexation of Fox Run in 1990 based on § 1926(b), the case would have been dismissed as not involving a case or controversy because (1) Grafton had no plans to provide water service to Fox Run at that time, and (2) there was no federal indebtedness. *See State v. Kole*, No. 99–A–0015, 2000 WL 1460031, *4 (Ohio App. 11 Dist. Sept. 29, 2000) (declining to render an advisory opinion where no case or controversy was present) (citing *State v. Saylor*, 125 Ohio App.3d 636, 709 N.E.2d 231 (1998)); *McCurry ex rel. Turner v. Adventist Health System/Sunbelt, Inc.*, 298 F.3d 586, 597 (6th Cir.2002) (case or controversy requirement prevented federal court from issuing advisory opinions) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) ("[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them."); *General Elec. Co. v. Local 761, Int'l Union of Elec., Radio & Machine Workers*, 395 F.2d 891, 895 (6th Cir.1968)).

Second, annexation of property located within a rural water association alone does not remove that land from the water district for purposes of § 1926(b). *See supra*, at 576–77. And there is no evidence, nor has it been alleged, that Grafton ever petitioned the Lorain County Common Pleas Court to annex Fox Run out of the RLCWA's service district.

Third, every court to have reviewed and interpreted the legislative history behind § 1926(b) has concluded that the statute should be liberally interpreted to protect the federally indebted water association from municipal encroachment, and that any doubts should be resolved in favor of the association. *See e.g., Adams*, 226 F.3d at 517–18; *Wayne*, 36 F.3d at 527–28. *But see Le–Ax*, 346 F.3d at 708 (where divided majority held that a water district can only invoke § 1926(b) as a shield to protect its geographic boundary). Given this clear mandate and the lack of case law on point, the Court finds that the curtailment of service provided or made available to Fox Run by the RLCWA occurred at the time that Grafton began to provide water service to the development. Because the RLCWA was the recipient of federally insured funds at that time, the Court concludes that § 1926(b) prohibits Grafton from serving Fox Run.

This construction of the term "curtailment" comports with the letter of § 1926(b). The statute literally provides that "[t]he service ... made available

ton cites *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483 (N.D.Iowa 1997). The Court notes only that *Rural Water Sys. # 1* is factually distinguishable from the instant case because it involved the question of whether a water association could invoke § 1926(b) after its debt to the federal government expired (which it couldn't), and whether the water association had the physical ability to make service available to certain customers once the association became re-indebted to the federal government (which issue was tried to a jury). The cited case has no precedential effect on this Court's ruling because it is a district court decision from another state. It has no persuasive effect because it involves the interplay of various Iowa statutes that are in no way analogous to the Ohio statutes empowering regional water districts.

through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body ... during the term of such loan." Thus, it is the *provision of service* that cannot be curtailed while the water association is federally indebted. No one was providing water service to Fox Run in 1990 when Grafton annexed the land, so the date of annexation cannot be the date that service was curtailed. Additionally, the statute does not prohibit or restrict municipal annexation. Nor does it prohibit a municipality from serving customers within a water association's district when the association is not in debt to the federal government. The only thing the statute prohibits is any limitation of service made available by a federally indebted water association during the term of the indebtedness.

The Court's construction of "curtailment" also fosters the economies-of-scale policy embodied in § 1926(b). To construe the term in the manner advocated by Grafton would frustrate the policy. It would encourage municipalities to annex undeveloped property located in a regional water district years before the municipality has any intention of developing it, only to claim laches, waiver or estoppel as a defense to the district's invocation of § 1926(b) when the municipality decides to develop the property and provide water service. This would lead to the piecemeal disintegration of the water district's customer base. In contrast, construction of "curtailment" in the manner espoused by the RLCWA effectuates the economies-of-scale policy because it protects the water association's customer base, spreads capital costs across a larger number of users thereby decreasing the per capita cost, encourages growth and maintenance of the association's infrastructure, and ensures that the association can service its debt and secure additional debt when needed—thus providing safe water in the most efficient manner to more people.

Finally, the Court's ruling does not violate the Sixth Circuit's recently articulated restriction against using § 1926(b) in an offensive manner, because the RLCWA is *not* trying to recruit new users outside its district. *See discussion of Le–Ax, supra,* at 575. Rather, the RLCWA is seeking to protect its service district and prevent the disintegration of its customer base. *Id.*

## IV. CONCLUSION

Section 1926(b) prevents a municipality from curtailing the service made available by a rural water association while the association is receiving federal, or federally insured, funds. In the instant case, the RLCWA has a transmission line in place which can serve Fox Run overnight. The transmission line was constructed to meet the ever-growing needs of Grafton residents, financed by a loan insured by the federal government, and installed prior to the development of Fox Run. The development of Fox Run occurred after the RLCWA incurred its federal indebtedness. Thus, Grafton's retention of revenues generated by serving Fox Run is prohibited under § 1926(b).

The tap-in fees and monthly revenues generated by serving Fox Run should go to the RLCWA because it is the RLCWA which is paying the fixed costs, and incurring the debt, for constructing and maintaining the infrastructure that makes water service available to land being developed at a rapid pace by the fifteen townships and two villages that comprise the RLCWA's district. Congress has decided that, at least while the federal government is making or insuring loans to such associations, the associations should

not have to compete with expanding municipalities that threaten to undercut the association's customer base and disrupt the economies of scale. *Le–Ax*, 346 F.3d at 705.

Accordingly, the Motion for Summary Judgment, filed by Village of Grafton and KNG, Ltd. (**ECF No. 40**) is hereby **DE-NIED**, and the Motion for Summary Judgment of Rural Lorain County Water Authority (**ECF No. 41**) is hereby **GRANTED**.

**IT IS SO ORDERED.**